*90 OPINION.
Kern:
The first issue for our disposition is whether the respondent correctly determined that petitioner realized ordinary income in the amount of $148,653.04 during the fiscal year 1936 as the result of a settlement of an account with Miller and Monroe jointly. The facts reveal that petitioner had become indebted in the amount of $182,-188.06 to the individuals. During the fiscal year this credit was offset by the transfer to the individuals of 500 shares in the Aptos Corporation. This stock had been carried on-the books of petitioner at a Amine of $100,000. Petitioner reported the difference between the total debt and the $100,000 stock paid as ordinary income.
Respondent’s determination is based upon the assumption that the stock was not worth $100,000, but only $33,535.02. Our findings of fact, hoAvever, show that the 500 shares, which constituted Aptos’ total issue, were worth $100,000 when issued. This conclusion is sufficient to dispose of respondent’s primary contention.
There is, however, a secondary issue still to be disposed of. Petitioner, by amendment to its petition, claims that it erred in reporting the $82,188.06 difference as ordinary income; and that it should be found to be capital gain which may be offset by any capital losses *91 suffered by petitioner within the fiscal year. Respondent and petitioner have already stipulated that petitioner suffered a capital loss in excess of the deduction claimed on its return upon the dissolution of the Improvement Co. Petitioner had erroneously reported this amount as a bad debt. Respondent argues that this amount is deductible only to the extent of $2,000, however, by virtue of the capital loss provisions of the revenue acts and, since petitioner has not established any capital gains to act as offsets, that the balance of this loss can not be taken into account for income tax purposes. Petitioner, on the other hand, in its amended petition claims that the $82,188.06 gain was a capital gain and when balanced against the $115,102.48 loss results in a net capital loss of $32,914.42, which amount is deductible to the extent of $2,000. If petitioner prevails, the result will be, in effect, the removal of the $82,188.06 figure from petitioner’s taxable income.
If the transaction whereby the two individuals acquired the stock from petitioner is to be regarded as a sale or exchange of the stock in return for the extinguishment of its preexisting debt in the sum of $182,188.06, then the difference between the cost to petitioner of the stock and the amount of its liability thus discharged must be regarded as capital gain. Petitioner was not a dealer in securities and did not hold the stock primarily for sale to customers in the ordinary course of its business. Therefore, it must be considered as a capital asset. Chemical Bank & Trust Co. v. United States, 21 Fed. Supp. 167; 85 Ct. Cls. 651.
If a capital asset is transferred in consideration for the extinguishment of a liability of the transferor in an amount less than the cost basis to the transferor of the asset so transferred, the resulting loss to the transferor is a capital loss within the meaning of the_revenue act. Rogers v. Commissioner, 103 Fed. (2d) 790; certiorari denied, 308 U. S. 580. Conversely, where the capital asset so transferred is held at a basis less than the amount of the transferor’s debt extinguished by such transfer, the resulting gain to the transferor must be considered as a capital gain. In each case the transaction is treated as if the transferor had sold the asset for cash equivalent to the amount of the debt and had applied the cash to the payment of the debt. See E. F. Simms, 28 B. T. A. 988; Carlisle Packing Co., 29 B. T. A. 514.
Respondent, however, contends that the transaction here involved should be considered as having been, in reality, two transactions. According to his construction petitioner transferred the Aptos stock, as to which its cost basis was $100,000, in satisfaction of $100,000 of the claim of Miller and Monroe, and then in a later and separate transaction Miller and Monroe gratuitously forgave the balance of petitioner’s obligation to them. Thus, as respondent interprets the facts, there was *92 a transfer’ which might have resulted in capital gain or loss, buc which resulted in neither, since the amount received was exactly equivalent to the cost basis of the asset transferred; and this was followed by the gratuitous forgiveness of the remainder of the indebtedness of petitioner, which resulted in the receipt of ordinary income. In support of this contention respondent points out that petitioner, on its books, treated the excess of the debt extinguished over the cost basis of the Aptos stock as miscellaneous income, and that petitioner treated it in its return as ordinary income. Respondent also relies upon part of an answer of one witness who was a party to the transaction, who referred to the transfer of the Aptos stock as a part payment of petitioner’s indebtedness. We do not agree with respondent’s interpretation of the facts. A careful consideration of all of the facts and circumstances disclosed by the record compels us to the conclusion that the transaction should be treated as one transaction, not two; that petitioner transferred the Aptos stock, a capital asset, to Monroe and Miller in return for their forgiveness of its debt to them of $182,188.06.; and that, since petitioner’s basis as to this stock was $100,000, it realized a gain thereby in the sum of $82,188.06, regardless of what the fair market value of the stock was; and that this was a capital gain against which could be offset capital losses.
The second main issue raised is whether respondent erred in failing to exclude from petitioner’s taxable income for the fiscal year 1936 the sum of $40,997.30 representing the portion of an indebtedness ..of $52,247.30 to the Pacific States Construction Co. of which petitioner was relieved by a compromise settlement within the taxable year for the lesser sum of $11,250. Petitioner reported the $40,997.30 as ordinary income on its return, but now claims the amount should not have been included because, it alleges, petitioner was insolvent at the time and did not thereby become solvent. The endeavor of petitioner to prove insolvency is not successful. Miller testified that in his opinion the assets were worth over a hundred thousand dollars less than the liabilities. He also read into the record certain figures from sheets he had prepared after examination of the corporation’s books. According to his testimony the books disclosed the value of the assets as of the close of the fiscal year 1936 to be $976,994.78, and the liabilities on the same date to be $1,313,444.78. By the close of the next year the assets had fallen to $884,668.48 and the liabilities to $1,179,965.52. The change in these figures was, according to Miller’s testimony, occasioned by purchases of land by Aptos and other brokers. When questioned as to whether the value of the assets was calculated with regard to fair market value of the properties held, Miller said that'the figures were based on cost from 1925 to 1927. He then went on to say that the financial depression had greatly lessened the value of *93 the properties, so that, in his opinion, the cost figures actually exceeded any fair market value of the lands.
Were it not for one of the exhibits introduced by petitioner without limitation to its application, we might have concluded that petitioner had established a prima facie case of insolvency. But this exhibit sets forth the sales by Aptos within the fiscal year 1937 of certain lands transferred by petitioner to Aptos at cost. The date of the transfer of this property to Aptos is not shown on the exhibit, but from the testimony it appears that it was not all transferred at once. The land was transferred to Aptos at cost, therein stated to be $254,910.90. As a result of hundreds of sales to the public during the fiscal year 1937, gross profits in the amount of $286,729.42 were realized, or over 100 percent. On only three transactions with the public were losses sustained, amounting to $1,353; and on two other sales made not to the public but to Miller and Monroe, large losses in the amount of $86,636.27 resulted. In these sales to Miller and Monroe. however, it is extremely dubious whether fair market value was ever taken into consideration or that the sales price is indicative of fair market Amine. Thus Ave see that, Avhile Miller claims that the properties in the hands of the petitioner were not worth cost, some considerable part, of them had a fair market value of twice that amount, as the sales records disclose. We do not know from the testimony ghen Avliat properties comprised the petitioner’s assets in the fiscal years 1936 or 1937. While there is much testimony about transfers of property to Aptos, no dates were given from which we can determine the holdings of petitioner at the times material to a finding of insolvency. Upon the facts shown by the record, we can not reach the conclusion that petitioner was insolvent at the time of the compromise, August 31, 1935, and conclude, therefore, that the $40,997.30 saved to petitioner by the compromise of this claim constituted ordinary taxable income to petitioner.
The third main issue, Avhich was raised in part by amendment to the pleadings at the hearing, concerns the transaction involving the 56 bonds. In the cases of Miller and estate of L. G. Monroe, the respondent has claimed that the individuals received taxable income in excess of that reported by them as the result of using Monroe & Miller, Ltd., in the transaction as a “middle-man.” Now, as an alternative to this content ion, respondent argues that the petitioner realized taxable income in the amounts of $56,000 and $16,380 representing, respectively, the principal amount of the bonds received from Monroe & Miller, Ltd., retired during the fiscal year 1937, and the accrued interest thereon. The amount of $16,380 was included in respondent’s original determination of deficiency; as to the $56,000, the issue was raised for the first time at the hearing. Bespondent fails to advance any tenable *94 theory for this position and introduces no proof to sustain such a conclusion. The burden of proof is upon the respondent as to any new issues raised in his answer in this case with regard to the taxability to petitioner of the $56,000 principal of the bonds. However, it is not necessary to decide even this phase of this issue on a basis of failure of proof, since the petitioner has introduced corporate records to show credits received by Monroe & Miller, Ltd., from petitioner in the full amount of the principal and interest of the bonds transferred, and there was testimony that these credits were paid off. Upon the facts disclosed by the record, we conclude that the petitioner paid out the equivalent of what it received, and that petitioner realized no taxable income by virtue of the transaction.

Decision will be entered wider Rule 50.